United States Court of Appeals,

Fifth Circuit.

No. 92-7688.

Axel HAUBOLD, Michael Emken, and John Sommerfeld, Plaintiffs-Appellants,

v.

INTERMEDICS, INC. and Carbomedics, Inc., Defendants-Appellees,

Jack C. BOKROS, Plaintiff-Appellant,

v.

INTERMEDICS, INC., and Carbomedics, Inc. Defendants-Appellees.

Jan. 26, 1994.

Appeals from the United States District Court For the Southern District of Texas.

Before REYNALDO G. GARZA, KING, and DeMOSS, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

Plaintiffs Jack C. Bokros, Axel Haubold, Michael Emken, and John Sommerfeld brought a cause of action against defendants Intermedics, Inc. and CarboMedics, Inc. to recover severance pay after the natural expiration of their ten-year employment contracts. United States District Judge Hugh Gibson granted defendants' motion for summary judgment after determining that the plan administrator did not abuse his discretion in finding the plaintiffs ineligible for severance benefits. We affirm.

I.

Plaintiffs' cause of action is brought against defendants Intermedics and CarboMedics in pursuit of benefits under the former employers' severance payment plans, which is governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461 (1985). Intermedics hired plaintiffs to be executives for their subsidiary company, CarboMedics, under a contract titled the Employment Agreement (the Agreement). The Agreement provided that plaintiffs would be employed for a term of ten years, from January 1, 1979 to December 31, 1988. The Agreement is governed by the laws of the State of California.

Prior to 1979, the plaintiffs were employees of the Medical Products Division of the General Atomic Company. The division was involved in the research, development, manufacture, and marketing of carbon-coated medical and dental prostheses and components, and in carbon-coating such items for other companies. One of the division's most valuable assets was its proprietary process for carbon-coating, known as the "pyrolite process," invented by Dr. Bokros.

Bokros, as an inventor and Director of the division, held the highest position and was in charge of the management and operation of the division. The other plaintiffs held similar executive-level positions within the division.

During 1978, General Atomic began negotiations for the sale of the division to Intermedics. Negotiations proceeded on two fronts: General Atomic and Intermedics negotiated as to the sale of the division, and Intermedics negotiated separately with Bokros as to continued employment of Bokros and his management team.

Plaintiff Bokros was hired as president of CarboMedics by then Intermedics president, Albert Beutel. He in turn authorized Bokros to hire a team of executives (plaintiffs Haubold, Emken, and Sommerfeld, as well as Robert Akins who has since dismissed his cause of action) to help run CarboMedics. Intermedics hired all of the plaintiffs to work for its subsidiary CarboMedics under a term contract for a period of ten years ending on December 31, 1988.

Each contract contained a provision which stated that fringe benefits and perquisites of comparable executives of Intermedics shall be available to the plaintiffs. Thus, as Intermedics improved existing benefits or created new ones for its other executives, it would be required to provide the same benefits to the plaintiffs.[1]

---

[1]Although this "same benefits" clause relieved the parties of the need to spell out required benefits in detail, Bokros and Beutel did discuss the matter of severance pay in the course of their negotiations. At the time of their negotiations, plaintiff Bokros and his management team were entitled to severance pay, under the General Atomic Severance Plan, of one week for every year of their employment. Beutel expressed his concern that Intermedics might contractually be required to bear the costs of severance pay if the acquisition constituted a "severance" of employment. He wanted the transfer of all management personnel to occur in such a fashion that there would be no severance pay liability. The plaintiffs agreed that they would accept immediate reemployment without severance pay, with the understanding that they would have the benefit of severance pay plan coverage in their employment with Intermedics. To fulfill this agreement, CarboMedics created a new severance plan modeled after the plan that had been in effect for the

Several years later, as the expiration of the contracts neared, the new management of Intermedics embarked on a major reorganization involving CarboMedics. As part of the reorganization plan, they transferred management authority over this subsidiary to other management personnel. When the plaintiffs contract expired on December 31, 1988, the employment relationship was terminated.

However, Intermedics refused to make severance payments under either the CarboMedics or Intermedics severance pay plans. Pursuant to the terms of the severance plans, the denial of benefits was reviewed by a company plan administrator, who affirmed the denial of benefits on the basis that the plaintiffs were not "involuntarily terminated" by the natural expiration of their employment contracts and such a dissolution is not covered under the severance pay plans.

On September 17, 1992, the district court granted defendants' motion for summary judgment on the grounds that the plan administrator did not abuse his discretion in determining plaintiffs' ineligibility for benefits. In arriving at this conclusion, the court found that the plaintiffs' employment relationship was governed by the unambiguous terms of the ten-year Employment Agreement and that the natural expiration of those contracts by the passage of time did not satisfy the eligibility requirements for severance payments under either the Intermedics or the CarboMedics Plans. Plaintiffs have appealed.

II.

On appeal, plaintiffs challenge the administrator's denial of benefits, asserting that the plans clearly encompass the plaintiffs' employment termination. They contend that summary judgment was inappropriate since the plan administrator's denial of benefits was a clear abuse of discretion.

Additionally, they argue that the district court failed to consider the CarboMedics plan in making its decision. The plaintiffs assert that the CarboMedics plan that existed prior to their

plaintiffs during their employment with General Atomic.

Defendants have never denied that, during the term of their employment, plaintiffs were participants with the umbrella of both the CarboMedics and Intermedics Severance Plans. However, distribution under either Plan is made only to employees who are not only *participants* but who are *entitled to receive benefits* under the particular Plans's written eligibility requirements.

termination is substantially different from the Intermedics plan that the court considered, in that it does not grant the administrator discretionary authority in granting benefits. The plaintiffs state that Intermedics did not submit a copy of this plan to the district court for consideration of the motion. The plaintiffs argue that without a copy of the CarboMedics plan before it, the district court could not possibly form a basis for summary judgment that disposed of both plans' coverage. However, the district court's order erroneously disposed of the entire case.

Defendants agree that the district court did not review the CarboMedics Severance Plan before rendering its decision, but the defendants claim that objection is waived since it was not raised in the response to summary judgment. Additionally, defendants contend that the assertion that the plan was created to benefit the plaintiffs is not ripe for appellate review since it was also not raised in the summary judgment motion below. We agree and move on to reviewing the plan administrator's interpretation of the severance plans.

III.

The Supreme Court recently addressed the appropriate standard of judicial review of benefit eligibility determination by plan administrators under ERISA. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109-15, 109 S.Ct. 948, 953-57, 103 L.Ed.2d 80 (1989). In *Firestone* the Court held that a denial of benefits challenged under section 1132(a)(1)(B) generally is to be reviewed under a *de novo* standard of review unless the benefit plan gives the administrator the discretion to determine eligibility for benefits or to construe the language of the plan. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 957, 103 L.Ed.2d 80 (1989). Where a benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, as do the plans involved in this case, we are restricted to reviewing the plan administrator's decision for an abuse of discretion. *See id.* In situations where the administrator is acting under a possible or actual conflict of interest, that factor must also be weighed in determining whether there is an abuse of discretion. *Id.,* 489 U.S. at 115, 109 S.Ct. at 957.

Section 4.0 (Limitations) of the Intermedics Inc. Severance Allowance Plan provides that, in the event of a question about eligibility for severance, the company has sole discretion to make an

independent judgment of the policy's applicability. R. 854. This provision clearly gives the plan administrator broad power to implement the severance plan and evaluate claimants' eligibility for benefits. Additionally, the CarboMedics, Inc. severance plan states that "sound judgment should be exercised in application of this policy." R. 876. Although the word "discretion" does not appear in this text, the phrase "sound judgment" is synonymous. This court recently concluded that *Firestone* does not require the word "discretion" or any other magic phrase to confer discretionary authority to the plan administrator. *Wildbur v. Arco Chemical Co.,* 974 F.2d 631, 637 (5th Cir.1992) (quoting *Block v. Pitney Bowes, Inc.,* 952 F.2d 1450, 1453 (D.C.Cir.1992)). Since exercising "sound judgment" in applying the policy necessarily contemplates interpreting Plan terms, the CarboMedics Plan also grants the type of discretionary authority contemplated in *Firestone.*

In cases in which application of this deferential approach has been found to be appropriate, this circuit traditionally has employed a two-step process in analyzing administrators' interpretations of benefit plans. "First, the court must determine the [legally] correct interpretation of the Plan's provision." *Batchelor v. International Bhd. of Elec. Workers Local 861 Pension & Retirement Fund,* 877 F.2d 441, 444 (5th Cir.1989); *see Denton v. First Nat'l Bank,* 765 F.2d 1295, 1304 (5th Cir.1985). Second, if the administrator has not given the plans the legally correct interpretation, the court must determine whether the administrator's interpretation constitutes an abuse of discretion. *See Batchelor,* 877 F.2d at 442, 444 & n. 10. If the answer is no, then the administrator's decision must be upheld. *See Jordan v. Cameron Iron Works, Inc.,* 900 F.2d 53, 56 (5th Cir.1990).

The *Jordan* case instructs us that, in determining the legally correct interpretation of the plans, we should consider: (1) whether the interpretation is consistent with a fair reading of the plans; (2) whether there has been uniformity in construction of the plans; and (3) whether the interpretation results in any unanticipated costs to the plans. *Jordan,* 900 F.2d at 56.

A. Consistent with Fair Reading of Plans

The Intermedics Severance Plan is straightforward in its language. It provides for severance payments "[t]o establish a uniform policy of providing short-term financial assistance for employees whose active employment is permanently terminated by the company under specified circumstances

below ...

> 3.1 Eligibility—A covered employee is eligible to receive a severance allowance within the limits of this policy providing:

>> 3.1.1 Employment was involuntarily terminated by the company as the direct result of a staff reduction....

Likewise, the CarboMedics plan also provides coverage for "involuntary" employment termination. R. 877.

Before evaluating the substance of the plan administrator's determination that the discontinuation of the plaintiffs' employment relationships were not involuntary, we must first determine whether the employment relationships ceased as a result of the expiration of the Employment Agreements or continued on "at-will" after their ten-year terms elapsed. The terms of the plans—not the plaintiffs' individual employment contract—are the ultimate source of entitlement to benefits. However, the employment contracts are relevant to help assess whether the termination of the employer/employee relationship was "involuntary" entitling the plaintiffs to severance benefits under the terms of the plans, or whether they contained contractually predetermined termination dates agreed to by both parties. Construction of the plans to determine eligibility, and interpretation of the employment contracts to decide whether the plaintiffs were "involuntarily" terminated at the expiration of the term are inseparable co-dependent problems.

1. The Employment Contract

As a term contract, unless the employment was continued by another agreement, the contract would naturally end on the assigned date. Because of this natural expiration, Intermedics has argued that plaintiffs were not terminated by the company as required under the severance pay plans, but rather by the expiration of the Employment Agreements. Defendants contend that plaintiffs are not due severance benefits because the agreement expired by its own terms and such a dissolution is not covered under Intermedics' severance pay plan.

In contrast, plaintiffs have asserted several theories as to why they were "involuntarily terminated." Plaintiffs first argue that the Employment Agreement's expiration amounted to an "involuntary termination" entitling them to severance benefits. Although the plans grant the company

discretion in resolving certain questions concerning eligibility, the plaintiffs argue that the denial of benefits was an abuse of discretion. Alternatively, Bokros and the other plaintiffs have advanced several theories as to why their employment did not end with the expiration of the Employment Agreement.

First, Bokros claims that he and Albert Beutel, President and CEO of Intermedics, discussed that the contract was not for a specific term of employment. Instead, they agreed that the employment would be "evergreen," which means although employment would be guaranteed for ten years, it would continue thereafter "at-will." Bokros, relying on Beutel's word, then informed the other plaintiffs (Haubold, Akins, Emken, and Sommerfeld) that the same oral agreement altered their contracts.

Additionally, while the agreement provided for employment for at least the agreement's ten-year term, some provisions looked beyond the term of the agreement. For example, a provision regarding stock benefits scheduled the vesting of a portion of these benefits beyond the expiration of the agreement. In other words, the agreement provided that Bokros might need to work more than the term of the agreement in order for these benefits to vest.

Intermedics also gained protection and limited Bokros' future employment for a period extending potentially far beyond ten years. The agreement provided that even after ten years, Bokros "shall not undertake any employment competitive, or in conflict with, the interests of [Intermedics] wherein the complete, unhampered fulfillment of the duties of that employment would inherently or inevitable call upon [Bokros] to reveal any such confidential or proprietary information or trade secrets." Record at 1042-43. Therefore, while the agreement had a ten-year term applicable to many of its provision, it also had the effect of significantly restricting Bokros' alternative employment indefinitely into the future.

Also, in 1985, plaintiffs advised Intermedics president orally and in memo that they intended to retire one year after their contracts expired. This action by plaintiffs is the basis of their argument that the Employment Agreements were superseded or modified by other oral or written agreements.

Plaintiffs assert that a review of their contracts and the surrounding circumstances clearly

evidences the parties' understanding that the contracts were ten year *job guarantees,* and not agreements in advance to terminate employment after ten years. In accepting these ten year job guarantees, the plaintiffs had at least the same expectation of "permanent" employment as was possessed by any "at-will" employee whose termination would apparently qualify for benefits.

This court is of the opinion that those arguments fail to broaden the substance of the term contract which would allow plaintiffs to qualify for severance benefits. First, the contract itself is unambiguous and straightforward in its terms, so parol evidence of any prior or contemporaneous modification is non-admissible to change the plain meaning of the contracts. *Ri-Joyce, Inc. v. New Motor Vehicle Bd.,* 2 Cal.App.4th 445, 3 Cal.Rptr.2d 546, 549 & n. 1 (1992) (extrinsic evidence of prior agreement contradicting inadmissible where contract not ambiguous). Sections three and four of the Agreement specify that the term of employment shall be for ten years, from January 1, 1979 until December 31, 1988, subject to prior termination as specified in the contract.

Additionally, plaintiffs have based a great part of their argument on the fact that the Employment Agreement was subsequently modified orally by the assurances of Beutel. Such assertions are also contradicted by the Agreement, which is very clear on the point of oral modification:

> 11. *Modification.* This Agreement constitutes the full and complete understanding and agreement of the parties, supersedes any prior understanding and agreements, and cannot be changed or terminated orally.

Moreover, this integration clause casts doubt on plaintiffs' claim of post-existing at-will employment with CarboMedics. Even if the plaintiffs had separate employment agreements which were underlying the written Employment Agreement, the *Modification* clause's integration language would have superseded this underlying agreement. Clearer language of the parties intent cannot be found.

The plaintiffs have also acknowledged, in their termination letters to Terry Marlatt in November and December of 1988, that the Agreements had terminated and sought information on their finalization papers. Those memos support defendants' argument that the Employment

Agreements expired on their own and no agreement existed to take their place.[2]

All alleged verbal promises relating to an extension or continuation of the plaintiffs' employment at the conclusion of the ten-year term are also void under the statute of frauds. Beutel's oral promises that after ten years, plaintiffs' employment status would return to at-will, if true, would have been an oral agreement that could not have been performed within one year from the date of its making. Instead, such an agreement would not commence for ten years. Therefore, this oral agreement would not satisfy the statute of frauds, which provides that an oral agreement which cannot be performed within one year from the date of its making is unenforceable. Cal.Civ.Code § 1624 (West 1993).

Plaintiffs' arguments that the September 1985 Memoranda were written modifications of the Employment Agreement are likewise insufficient.[3] In reviewing the documents, it becomes apparent that they cannot qualify either as modifications or as wholly separate contracts for employment. The memos do not contain any material terms and are not signed by the party sought to be bound.[4] *Roth v. Garcia Marquez,* 942 F.2d 617, 626 (9th Cir.1991).

We find that the employment relationships between the parties were created and governed exclusively by the written, ten-year Employment Agreements. Thus, looking within the four corners of the agreement, plaintiffs relationship did not continue after the ten-year term expired. Because the parties were unable to negotiate successor contracts when the original Agreements expired on

[2]*See* Affidavit of Peter Dorflinger, Exhibit 8, Attached to Defendants' Motion for Summary Judgment against Jack Bokros and Exhibits 13, 14, and 15 in same Affidavit of Motion for Summary Judgment against Haubold plaintiffs. The memos also discuss the payout of bonuses. Once the contract expired, plaintiffs never received any more salary compensation in return for services rendered to the company after the termination date. Only bonuses and compensation for services prior to termination remained to be paid.

[3]Similarly, plaintiffs' contentions that modification of the employment Agreement occurred as a result of a subsequent oral agreement and conduct of the parties in September 1985 fail. Cal.Civ.Code § 1698 (West 1992); *see Barrett v. Bank of America,* 183 Cal.App.3d 1362, 229 Cal.Rptr. 16, 21-22 (1986), *rev/reh denied,* (Nov. 26, 1986) (contract in writing must be modified by a contract in writing, unless original contract provides otherwise, or the oral agreement is supported by consideration).

[4]In Bokros deposition dated June 24, 1992 at pages 967-68, he states that no agreement was reached as to what the terms of the employment would be at the expiration of the original agreements.

December 31, 1988, the employer/employee relationship ceased.[5]

2. The Severance Plans

Having resolved that the Agreement controlled the term of employment, the question now is whether the natural expiration of these employment contracts constituted "involuntary termination" as contemplated in the severance plan provisions.

Severance plans typically provide for payment in cases of layoffs or involuntary termination resulting from a general reduction in force. Simply because an employment contract ends, it does not necessarily follow that there cannot be a layoff or involuntary termination within the meaning of the two severance plans before us. The determinative inquiry is whether there is evidence in the record of the kind of reduction in work force with which these severance plans were meant to address. Therefore, we decline to decide whether, as a matter of law, the natural expiration of an employment contract constitutes an involuntary termination, entitling the employee to severance benefits. We nevertheless affirm the district court's grant of summary judgment on the basis that the plan administrator's interpretation of these specific severance plans was proper.

There is no reference in the record before us to reflect a reduction in force. On the contrary, the plaintiffs' employment automatically ended by operation of law when their Employment Agreements expired, not because they were "terminated by the company" or involuntarily "laid off" as required by the threshold conditions for eligibility. By mutual agreement, each plaintiff hired on for a specific ten-year period. When the term concluded, the contracts had been fully performed and the employer-employee relationship merely ceased. Moreover, the record reflects that the executive team was in the process of being replaced due to a management reorganization, not eliminated due to a reduction in force.

As additional support for the notion that the discontinuation of the employer/employee

_____

[5]The plaintiffs contend that it was not their desire to resign. However, the defendants dispute this assertion and suggest that, in fact, the company essentially offered to renew the existing contracts, without reduction in compensation or benefits to plaintiffs. But since the plaintiffs wanted additional concessions, the negotiations were terminated and the parties agreed to part company at the expiration of the Employment Agreement. Moreover, as that date approached, the plaintiffs submitted memos to the company informing them that their employment would end on December 31, 1988.

relationship was not involuntary, we are persuaded by the fact that the company instigated negotiations to renew plaintiffs' Employment Agreements on essentially the same terms, but the plaintiffs refused, demanding a better deal than the one they had lived by for the previous ten years. This is not the description of being fired, terminated, or involuntarily laid off. The plaintiffs did not even contemplate receiving severance benefits upon entering the employment contracts, evidenced by the fact that the lawsuit had been going on for two and a half years before the plaintiffs amended their petition to assert claims for severance pay benefits. Consequently, we conclude that the plan administrator's interpretation comported with a fair and reasonable reading of the severance plans.

B. Uniform Construction

Plaintiffs allege that they were owed perquisites and fringe benefits comparable to that of similarly situated Intermedics' executives. Yet plaintiffs have not provided any evidence that they received fewer benefits than comparable Intermedics' executives. There is no evidence presented that would indicate that the plan administrator has inconsistently applied the severance pay provisions.

Moreover, neither party has presented evidence of previous actions in handling claims of similarly situated workers. Thus, there is no basis for making a finding concerning the uniformity of construction given the plan.

C. Unanticipated Costs

In reviewing the correctness of the plan administrator's interpretation, we must decide whether either of the interpretations would give rise to "substantial unanticipated costs to the Plan." *Batchelor,* 877 F.2d at 445. If the given interpretation results in such costs, then the interpretation is probably not legally correct. *Id.* The record is devoid of any allegations that the interpretation resulted in unanticipated costs to the plans. Because of this lack of evidence, there is no basis for us to make a finding regarding unanticipated costs.

Once again, neither side has presented any evidence relating to unanticipated costs to the plan; we can make no finding on this issue.

IV.

Severance plans have specific eligibility requirements which an employee must meet to receive

payment, and the plan administrator concluded that the natural expiration of an employment contract does not satisfy those requirements. We agree that the termination of the plaintiffs' employment relationship does not qualify for severance since there was a predetermined termination date, no evidence of a reduction in force, and evidence of an attempt on the company's part to negotiate for continued employment.

Plaintiffs have not pointed to any evidence in the record to prove that the administrator's decision to deny benefits to plaintiffs did not meet with the *Jordan* criteria. They did not present any evidence of defendants' treating other similar employees' claims differently. Plaintiffs did not submit evidence that defendants' decision resulted in unanticipated costs to plaintiffs. Moreover, we hold that the decision of the administrator complied with a full and fair reading of the Intermedics severance pay plan that the natural expiration of plaintiffs' employment contracts is a quite different situation than being involuntarily terminated by the company.

In light of this evidence, our own reading of the plans, and after careful consideration of the actual conflict of interests under which the plan administrator was acting, we are persuaded that the plan administrator gave the plans their legally correct interpretation. Accordingly, the decision to deny the plaintiffs' severance benefits was not an abuse of discretion. The grant of summary judgment was proper.

AFFIRMED.